Filed 6/22/22  P. v. Sinsun CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISAAC SINSUN,<br><br>    Defendant and Appellant. | 2d Crim. No. B315693<br>(Super. Ct. No. 2016006819)<br>(Ventura County) |

Isaac Sinsun appeals the trial's court postjudgment order denying his petition for resentencing on his 2017 murder conviction pursuant to Penal Code[1] section 1170.95, which was enacted pursuant to Senate Bill No. 1437.  In denying the petition following an evidentiary hearing, the trial court found "beyond a reasonable doubt that [appellant] could be convicted of the charged offense as the actual killer, an aider to the actual killer, and/or a major participant acting with reckless

---

[1] All statutory references are to the Penal Code, unless otherwise noted.

indifference to human life."  Appellant contends the court committed reversible error by applying the wrong burden proof in making its findings.  We affirm.

## FACTS AND PROCEDURAL HISTORY[2]

Joaquin Castaneda died from a point blank shotgun blast to his head on the evening of November 13, 2005; the shot cup was embedded in his skull.  Leading away from his body were bloody tire tracks and bloody footprints.  He wore a Pinkerton Security uniform shirt.  His back pocket was pulled out and his wallet, identification and cell phone were missing.

The shooting occurred in a poorly-lit industrial area in Oxnard.  A witness, Frank Ramos, heard people arguing in a car parked directly behind his van; a man yelled, "[G]et the fuck out" followed by the sound of a heavy gauge gunshot.  Ramos next heard two men next to his van whispering, "Come on.  Hurry up. . . .  Let's go.  Let's get the fuck out of here."  A third man calmly replied,  "Hold on."  Ramos heard car doors shutting, looked out, and saw two cars driving away from the scene. Ramos found Castaneda on the ground behind the van.

Another witness, Victor Ortiz, heard arguing and a gunshot come from a car.  He hid behind bushes.  He heard the word "vamanos" and car doors closing after the gunshot.  Ortiz saw a pick-up truck and a sedan drive away.  He called police.

---

[2] The relevant facts are recited from our prior opinion affirming the judgment on direct appeal, of which we take judicial notice on our own motion. (*People v. Sinsun* (July 23, 2019, B284836) [ nonpub. opn.].)  We previously granted appellant's request for judicial notice of the clerk's and reporter's transcripts in the prior appeal.

When police found Castaneda's sedan the following morning, it had blood stains on the exterior and tires. The driver's seat was soaked in his blood. It appeared he was shot while seated then pulled from the car.

One day after the homicide, a red pick-up truck parked at a motel in Oxnard drew police attention because its rear license plate was missing and the front plate was upside down. A woman opened a motel room door then immediately closed it when she saw officers examining the truck. They knocked on her door. In the room they found Valerie Corona, her husband, her brother and her cousin, appellant Sinsun.

Corona authorized police to search the truck for her identification. During the search, officers found bloody clothing behind the driver's seat. Crime lab analyses showed that the clothing--a white T-shirt, a black long-sleeve shirt and black pants--bore Castaneda's blood DNA. The seat of the pants was saturated with blood. The stain went through the material into the pocket inserts, as if the person wearing them was sitting in a pool of blood. Officers found blood spatter on a bed sheet in the truck; they found identical sheets (the same color, pattern, size and manufacturer) in Castaneda's car.

Appellant was detained under a search warrant for DNA testing. The clothing recovered from the pick-up truck carried "ownership DNA" from either appellant or his identical twin David. Forensic DNA tests cannot differentiate between identical twins. Photos of appellant's body showed a circular bruise on his right shoulder; a firearms expert opined that it was caused by the recoil of a shotgun.

Investigators enlisted an informant, Ismael Cano, to get jailhouse statements from appellant. Police told Cano they

3

sought information on a homicide in an industrial area in Oxnard, without specifying that a car or shotgun was involved. Appellant was in custody, though not for killing Castaneda. He was moved to a cell with a recording device, near Cano.

Detectives arranged to take a DNA swab from Cano in front of appellant, to give Cano more credibility and trigger a conversation between them. It was Cano's idea to say he is in the Mexican Mafia, a gang that carries out killings in prison. Appellant is a Colonia Chiques gang member. Bragging about gang crimes while incarcerated enhances one's status.

Conversations between appellant and Cano were recorded on March 15-19, 2006. After a number of friendly exchanges, Cano told appellant he was swabbed for DNA on an alleged homicide; appellant said his DNA was taken for the same reason. Appellant said that his home was searched and his clothing was taken, but police "had nothing 'cause us, we torched everything, homie;" plus, he got rid of "the big thing" by selling it.

Cano said he trusted appellant and claimed to have killed a "white boy" with a nine millimeter Beretta, dumping the body in an alley. Appellant responded that he used "a shottie" (shotgun). Cano commended appellant, telling him that police cannot use ballistics on "the little bullitos" from a shotgun. Appellant disagreed, saying that police can get ballistics "off anything, homie." Appellant said that the shooting was outdoors and the victim was in a car.

Appellant told Cano "you gotta burn everything" because blood spatter can travel. Appellant said he fired "[p]oint blank. And I didn't see nothing on my clothes. You just can't take a chance." Appellant was not perturbed when his clothing was taken for DNA testing at the Oxnard police station because "it

4

was all brand new." Appellant stated that he watches forensic programs to learn how police investigate crimes.

Cano told appellant that there is "a pegada [hit] on you and your brother, fool. They're waiting for you to get up to the joint [prison]" because "you guys blasted somebody's jefe from Southside, a civilian." Appellant exhaled audibly and said, "[f]uck." He explained, "[w]e smoked" (shot) a "vato" (guy) in a car parked in a commercial area, believing he was an undercover police officer, adding "we just got a personal beef with the juras [police], you know." He and his brother wanted to "do some fuckin' damages, so we rolled up on this fool." When Castaneda resisted, "we domed this fool," meaning they shot him in the head. Appellant was pleased "we got one" because he and his brother hoped to catch a police officer "slipping."

Appellant spoke to Miguel Alvarez, an inmate with Mexican Mafia tattoos. Alvarez previously served as an informant. Though he was not working for Oxnard police in appellant's case, he gave them information from appellant. In a conversation, appellant told Alvarez that he and David killed a man in a car, believing him to be an undercover officer, by shooting him in the head. Appellant explained to Alvarez that he later learned the victim was the father of a rival gang member named Lucky, who intended to harm appellant and David. Appellant wanted help from Alvarez, who instructed appellant to put his request in writing.

In a "kite" (prison note) to Alvarez, appellant wrote, "we own up to what we did" on the "jefe" (father) of gang member Lucky, who thinks that appellant was trying "to get at him" by killing his father. Lucky had approval to kill appellant and his brother, once they went to prison. Appellant wrote that he

5

mistakenly believed Castaneda was a police officer in an unmarked car. The victim seemed to reach for a weapon when they told him to get out of the car, so "we do what we have to." Appellant asked Alvarez "what should we do to get it straightened out. . . . I need some advice on what direction to go." Appellant also asked Alvarez to destroy the kite.

Yvette Baird rented a room in appellant's house in 2014. She witnessed an argument between appellant and his mother, who screamed at him, "I know you killed him." Appellant struck his mother to the ground and told her to shut her mouth. He did not deny her accusation. Baird later bumped into appellant accidentally in the hallway of his home. He pulled out a knife, pushed Baird against the wall, put the knife to her throat and said "he had killed before, he'd kill again. Killing [Baird] would mean nothing. Stay out of his way." Baird moved out of appellant's house.

Appellant's cousin Valerie Corona testified on his behalf. She stated that appellant's twin David was wearing black pants and a black shirt on the morning of November 13, 2005, similar to the ones police found in her pick-up truck. The next time she saw David, that evening, he was carrying similar-looking clothing, rolled up. When police found the bloody pants in Corona's truck the next day, they asked her to whom they belonged; she said that she did not know. Later, David told Corona that the clothing was his and explained that he and two friends shot someone in a car the previous night, during a robbery. Corona did not tell police that David committed the murder. She did not say anything about David's admission until

she spoke to a defense investigator in May 2017, shortly before appellant's trial.[3]

A jury convicted appellant of first degree murder (§§ 187, subd. (a), 189) and the trial court sentenced him to 25 years to life in state prison. Although the jury was instructed on theories of aiding and abetting (CALCRIM No. 400), murder with malice aforethought (CALCRIM No. 500), and felony murder (robbery or carjacking; CALCRIM NO. 540B), the verdict did not specify the theory upon which appellant was convicted. We subsequently affirmed the judgment on appeal. (*People v. Sinsun*, *supra*, B284836 [nonpub. opn.].)

In May 2020, appellant filed a petition for resentencing under section 1170.95. Counsel was appointed to represent him and the prosecution filed an opposition and supplemental brief. The trial court found that appellant's petition set forth a prima facie case for relief and accordingly set the matter for an evidentiary hearing (§ 1170.95, subd. (d)). At the prima facie hearing, both parties indicated they would not be presenting any new or additional evidence and urged the court to decide the matter based on the record of conviction.

---

[3] Corona's testimony was inconsistent. Her recorded statement to the defense in May 2017 indicated that she loaned the pick-up truck to David on the evening of the murder and he returned it the following morning. At trial, she changed course and denied loaning the truck to David. Corona told police on November 14, 2005, that appellant was not with her the evening of the murder; by contrast, at trial she testified that appellant was with her, helping her move, although he may not have been with her at the exact time of the murder.

At the evidentiary hearing, the trial court stated that "although the standard of proof may be in dispute, the parties for purposes of this hearing agree that it was proof beyond a reasonable doubt." After the court indicated that it had reviewed the record of appellant's conviction (including the approximately 1,600 pages of reporter's transcript, most of the trial exhibits, and the preliminary hearing transcript), the prosecutor argued that "the evidence shows beyond a reasonable doubt that [appellant is] the actual killer based on his statements in the jail operation where he said that he shot him. And . . . if there's some dispute about him being the actual killer, clearly, based on all the witnesses and all the testimony, he aided and abetted the killer with the specific intent to kill." The prosecutor also told the court "[i]f you don't believe he's the actual killer or aided and abetted with intent to kill, he clearly was a major participant" in the underlying robbery and/or carjacking who acted with reckless indifference to human life.

In urging the court to find that appellant was entitled to resentencing, defense counsel began by noting "as we agreed, proof is beyond a reasonable doubt, and that means you act as a factfinder as well as—essentially, as a juror [*sic*] of one. So I'm going to [treat this as] a modified closing argument." Counsel "impress[ed] upon the Court" that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . . [Y]ou tell juries all the time . . . is this fact proven beyond a reasonable doubt and does this fact satisfy an element of the offense beyond a reasonable doubt?" Counsel argued among other things that the DNA evidence merely showed appellant or his twin brother David was present at the

crime scene and that his jailhouse statements admitting his participation in the murder were not credible.

The trial court then told the prosecutor to "assume for a minute that the Court cannot find that [appellant] was the actual killer" or a direct aider and abettor and asked whether the evidence proved he was a major participant who acted with reckless indifference to human life. In outlining the evidence, the prosecutor noted that the court had to decide whether appellant's inculpatory statements were credible.

At the conclusion of the hearing, the court took the matter under submission and indicated its intent to issue a written decision. In its written order denying the petition, the court stated "the parties agreed that the standard of proof is beyond a reasonable doubt." The court "recognize[d]" that the issues in [the direct] appeal did not involve resentencing pursuant to section 1170.95," but was "satisfied that the factual summary in the appellate decision is a sufficient factual summary to make a ruling on the issue presented." The court went on to state that "[b]ased on the facts of this case the Court finds beyond a reasonable doubt that [appellant] could be found guilty of murder" as the actual killer, a direct aider and abettor, and/or as a major participant who acted with reckless disregard for human life. The court noted that the evidence at trial "included [appellant's] admission that he killed the victim with a shotgun blast to the head."

## DISCUSSION

Appellant contends the order denying his petition for resentencing under section 1170.95 because the trial court applied the wrong burden of proof at the evidentiary hearing to which he was indisputably entitled. We conclude otherwise.

9

As relevant here, section 1170.95 permits individuals convicted of murder under a felony murder theory to petition the sentencing court to have their convictions vacated and to be resentenced on any remaining counts when, among other things, the petitioner could not be convicted of murder after Senate Bill No. 1437's changes to the law. (See § 1170.95, subd. (a)(3).) These changes include the amendment of section 189, subdivision (e) to provide that a defendant is not guilty of murder unless the defendant: (1) was the actual killer; (2) acted with the intent to kill as an aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life, as described in the special circumstance statute. (See § 189, subd. (e); Stats. 2018, ch. 1015, § 3.)

After ascertaining that the petition contains certain required information, the court must determine whether the petitioner has made a prima facie showing of entitlement to relief. (§ 1170.95, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 960-968.) Where the court finds the petitioner has made such a showing, it must issue an order to show cause and hold an evidentiary hearing on the petitioner's eligibility for relief. (§ 1170.95, subds. (c)-(d).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by [Senate Bill No.1437]. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) "The question is whether the petitioner committed murder under a still-valid theory, and that is a factual question. The Legislature made this clear by explicitly holding the People to the beyond a reasonable

10

doubt evidentiary standard and by permitting the parties to submit new or additional evidence at the hearing on eligibility." (*People v. Clements* (2022) 75 Cal.App.5th 276, 294.) "A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

Here, the parties repeatedly emphasized that the prosecution bore the burden of proving to the trial court beyond a reasonable doubt that appellant was guilty of murder and thus not entitled to resentencing. The court also set forth this burden of proof in its written order. Appellant nevertheless contends the court did not actually apply this burden in adjudicating the petition because it stated that appellant "could be found guilty of murder" under a still-valid theory. Appellant did not raise this claim below so his claim is forfeited.

In any event, we are not persuaded that the court applied the wrong burden of proof. Although the court's written order inartfully states that appellant "could" still be found guilty of murder instead of expressly stating that he *is* still guilty of that crime (see *People v. Clements*, *supra*, 75 Cal.App.5th at pp. 295-296), the record as a whole makes clear that the court understood its task was to decide—as a "jury of one"—whether the evidence proved beyond a reasonable doubt that appellant is guilty of murder notwithstanding the statutory changes effected by Senate Bill No. 1437. Moreover, the court's reference to whether appellant "could be found guilty of murder" merely tracks the language of subdivision (a)(3) of section 1170.95, which states that a petitioner is entitled to resentencing if he or she "could not presently be convicted of murder . . . because of changes to

11

Section 188 or 189 made effective January 1, 2019." Appellant's claim that the court applied the wrong burden of proof in adjudicating his petition thus fails.[4]

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

---

[4] In light of our conclusion, we need not address appellant's contention that the claimed error is structural and thus cannot be considered harmless. (See *People v. Garrison* (2021) 73 Cal.App.5th 735, 745-747 [trial court's error in applying wrong burden of proof at § 1170.95 evidentiary hearing was not structural; error deemed harmless because "[defendant's] admission to personally using a handgun in the course of a murder was tantamount to admitting that he was the actual killer"].)

Anthony J. Sabo, Judge
Superior Court County of Ventura
_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.